UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

VALERIE J. LANDRIE,

                    Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                  Defendant.

Case No. 3:10-cv-05806-RBL-KLS

REPORT AND RECOMMENDATION

Noted for December 16, 2011

Plaintiff has brought this matter for judicial review of defendant's denial of her

application for supplemental security income ("SSI") benefits.  This matter has been referred to

the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR

4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).

After reviewing the parties' briefs and the remaining record, the undersigned submits the

following Report and Recommendation for the Court's review, recommending that for the

reasons set forth below, defendant's decision to deny benefits should be reversed and this matter

should be remanded for further administrative proceedings.

FACTUAL AND PROCEDURAL HISTORY

On November 16, 2007, plaintiff filed an application for SSI benefits, alleging disability

as of September 1, 2006, due to memory problems, depression and anxiety.  See Administrative

Record ("AR") 12, 134, 139, 169.  Her application was denied upon initial administrative review

and on reconsideration.  See AR 12, 80, 84.  A hearing was held before an administrative law

REPORT AND RECOMMENDATION - 1

judge ("ALJ") on September 24, 2009, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. See AR 24-75.

On October 28, 2009, the ALJ issued a decision in which plaintiff was determined to be not disabled. See AR 12-23. Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on September 3, 2010, making the ALJ's decision defendant's final decision. See AR 1; see also 20 C.F.R. § 416.1481. On November 4, 2010, plaintiff filed a complaint in this Court seeking judicial review of the ALJ's decision. See ECF #1-#3. The administrative record was filed with the Court on March 14, 2011. See ECF #9. The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues the ALJ's decision should be reversed and remanded to defendant for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred: (1) in evaluating the medical evidence in the record; (2) in assessing plaintiff's credibility; (3) in assessing her residual functional capacity; and (4) in finding her to be capable of performing other jobs existing in significant numbers in the national economy. The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while defendant's decision should be reversed, this matter should be remanded for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767

F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

REPORT AND RECOMMENDATION - 3

opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>See</u> <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>see</u> <u>also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.     Dr. Harmon

Plaintiff challenges the following findings made by the ALJ:

A[n] . . . evaluation was conducted by Dana Harmon, Ph.D. on September 7, 2007 (Exhibit 3F). Dr. Harmon administered a Folstein Mini-Mental Status Examination (MMSE); the claimant scored 23 out of 30. The claimant had difficulties with serial 7's and spelling the word "world" backwards. A Trails B Test showed moderate to severe impairment. Dr. Harmon noted that "past treatment with antidepressant medications helped [the claimant's] mental

clarity and day-today functioning" (Exhibit 3F at 4). Dr. Harmon also noted
"moderate" to "severe" functional limitations (Exhibit 3F at 2). I have
place[d] little weight in Dr. Harmon's opinion as to the claimant's functional
limitations because Dr. Harmon simply completed a check-box form and there
is no explanation of the evidence relied upon in forming her opinions.

AR. 19. Plaintiff argues, and the undersigned agrees, that these are not legitimate reasons for
rejecting the opinion of Dr. Harmon.

As plaintiff points out, Dr. Harmon did not simply check off boxes on a form, but she
also summarized plaintiff's history, set forth her own observations of plaintiff during the course
of the evaluation, and conducted a mental status examination as well as psychological testing.
See AR 246-50. 261; Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (opinion based on
clinical observations supporting diagnosis of depression is competent medical evidence);
Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000) ("[W]hen mental illness is the basis
of a disability claim, clinical and laboratory data may consist of the diagnoses and observations
of professionals trained in the field of psychopathology.") (quoting Christensen v. Bowen, 633
F.Supp. 1214, 1220-21 (N.D.Cal.1986)); Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa
1999) ("The results of a mental status examination provide the basis for a diagnostic impression
of a psychiatric disorder, just as the results of a physical examination provide the basis for the
diagnosis of a physical illness or injury."). Thus, the ALJ's reasons for rejecting Dr. Harmon's
opinion are erroneous and cannot be upheld.

        B.      Dr. Covell

The ALJ also found in relevant part as follows:

On February 4, 2008, Dr. [Christmas] Covell[, Ph.D.,] conducted a
psychological examination of the claimant. Dr. Covell's evaluation was based
upon an Adult Function Report completed by the claimant (Exhibit 1E), a
Wechsler Memory Scale -Third Edition (WMS-III), a Comprehensive Trail
Making Test, a clinical interview, and mental status examination of the
claimant (Exhibit 4F at 1-2). The claimant told Dr. Covell she had been clean

and sober for a year and was "doing really good" (Exhibit 4F at 4). The claimant also reported fairly active activities of daily living to Dr. Covell.

> [Ms. Landrie] reported regular contact with her grandmother and mother, and stated that she attends church, though "I don't know anyone there really." . . . [She] indicated that on a typical day she arises early to attend groups at the methadone clinic (they begin at 7 am). She added that "if I sleep past 7 or 8 o'clock I feel like the whole day is wasted . . . I am afraid to miss it [the day]." She stated that she attends groups, GED classes or a workout, before "I take care of anything I have to . . . then I get my son from school." She indicated that she takes care of her son for a few hours before taking him home. She does any homework she needs to complete before going to bed[:] "I try to go to bed early so I can get enough sleep." She added that this routine is important to her for maintaining her sobriety and managing depressive symptoms. Ms. Landrie reported that she is capable of managing her hygiene and grooming needs independently. She prepares her own meals, at moderate levels of complexity, and denies difficulty using the stove or oven . . . She stated that she uses the public bus and has no difficulty as long as the buses are not crowded, and[:] "I catch certain buses. The ones I know."

(Exhibit 4F at 6).

The mental status examination showed orientation to person, place[,] time and situation. Dr. Covell noted the claimant's attention and concentration ability to be average. The claimant did not demonstrate difficulty tracking changes in conversation. She was able to complete serial 3's, and could spell a simple word forwards and backwards. The claimant also demonstrated an ability to follow simple three-step oral instructions and a written direction. The claimant was able to recall events that occurred earlier that day such as the examiner[']s name, information from the informed consent procedure and three objects immediately and after a period of distraction and delay. Dr. Covell stated the claimant's judgment and problem solving ability appeared limited and her fund of knowledge appeared to be in the low average range. The claimant "demonstrated a concrete thinking style, based on her identification of similarities between objects and interpretation of proverbs" (Exhibit 4F at 5).

Based upon the claimant's WMS-III scores (Exhibit 4F at 7), Dr. Covell opined the claimant's ability to hold auditory and visual-spatial information in temporary storage and recall new information after a brief interval were in the average range. The claimant's ability to retrieve recently learned information varied depending on the mode the information was presented. The claimant demonstrated a relative strength in her ability to retrieve visually presented information but showed some difficulty in retrieving recently learned auditory

information.  The results of a comprehensive Trails Making Test were below average in all areas (Exhibit 4F at 7).

Dr. Covell concluded that the claimant has mild cogitative and/or memory impairments (Exhibit 4F at 9).  Dr. Covell also stated the claimant's tolerance for stress and change was limited and that her prognosis would improve with management of her affective symptoms, a greater period of stability and sobriety and development of affective regulation and problem solving skills (Exhibit 4F at 10).  Despite these limitations, Dr. Covell opined the claimant's abilities to complete simple tasks and social interaction skills to be generally adequate (Exhibit 4F at 10).  Dr. Covell diagnosed the claimant as follows: (Rule Out) Posttraumatic Stress Disorder, Chronic; (Rule Out) Anxiety Disorder, Not Otherwise Specified; (Rule Out) Major Depressive Disorder, Recurrent, Moderate; Cocaine Dependence, Early Full Remission; and Opioid Dependence, Early Full Remission, On Agonist Therapy (Exhibit 4F at 9).

AR 19-20.  The ALJ went on to state he was placing "great weight" on Dr. Covell's opinion that plaintiff's ability "to complete simple tasks and social interaction skills are generally adequate." AR 20.

Plaintiff argues the ALJ erred in not discussing Dr. Covell's mentioning of the fact that she had difficulty locating the bathroom (requiring directions to "be repeated several times and broken into short phrases"), that psychological testing results suggested "possible frontal lobe impairment," that her reasoning and judgment were both impaired, that she was assessed with a global assessment of functioning ("GAF") score of 45-55,[1] and that deficits in her executive functioning skills would "limit her ability to organize and plan tasks, particularly under pressured conditions or in 'busy' environments." AR 266, 269-71.  But the undersigned finds no error on

---

[1] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007).  It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007).  "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning."); England, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).  "A GAF of 51-60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Tagger v. Astrue, 536 F.Supp.2d 1170, 1173 n.6 (C.D.Cal. 2008) (quoting DSM-IV at 34).

the part of the ALJ here.  First, although plaintiff may have been observed having problems with finding the bathroom, or in understanding directions thereto, this does not necessarily mean these are issues that translate into a work setting.  Indeed, Dr. Covell did not express an actual opinion in this regard.  <u>See</u> AR 266, 269-71.

Second, again while psychological testing may have suggested a possible impairment in her frontal lobe, Dr. Covell did not translate this suggested possibility into an actual work-related limitation.  <u>See</u> AR 269-71.  He did find plaintiff's reasoning and judgment to be impaired, but did not state with any specificity to what extent or what impact that impairment had (if any) on her ability to perform work-related activities, or give any indication such impairment would be more restrictive than the mental functional limitations the ALJ adopted.  The undersigned further finds the ALJ's determination that plaintiff could not perform production rate pace work and could deal with only occasional work setting changes, adequately account for the limitations Dr. Covell found that she had in "her ability to organize and plan tasks, particularly under pressured conditions or in 'busy' environments."  AR 16, 271.

It is true that a GAF score is considered to be "relevant evidence" of a claimant's ability to function mentally.  <u>England</u>, 490 F.3d at 1023, n.8.  However, while a GAF score may be "of considerable help" to the ALJ, for example, in assessing a claimant's residual functional capacity, "it is not essential" to the accuracy of that assessment.  <u>Howard v. Commissioner of Social Security</u>, 276 F.3d 235, 241 (6th Cir. 2002).  Thus, an ALJ's "failure to reference the GAF score" in assessing a claimant's residual functional capacity "standing alone" does not make the residual functional capacity assessment inaccurate.  <u>Id.</u>  In other words, the mere fact that the ALJ did not expressly discuss the GAF score assessed by Dr. Covell here, does not make the ALJ's evaluation of Dr. Covell's opinion necessarily inaccurate, given that as just discussed,

that evaluation has not been shown to be otherwise erroneous.

Lastly, plaintiff takes issue with the ALJ's statement that Dr. Covell found her prognosis "would improve with management of her affective symptoms, a greater period of stability and sobriety and development of affective regulation and problem solving skills." AR 20. Although it is true that this is not actually what Dr. Covell said – stating instead that she "may function adequately within a structured environment with significant social support and latitude/tolerance for performance errors (or learning over time)" (AR 271) – once more the undersigned finds the ALJ's adopted limitations properly account for Dr. Covell's opinion here. As noted above, the ALJ found plaintiff could not do "**production rate pace work**." AR 16 (emphasis in original). The ALJ also found she could do work that needed "**little or no judgment**," perform "**simple duties**" that could "**be learned on the job in a short period**" of time, and "**deal with occasional work setting changes**." Id. (emphasis in original). Again, Dr. Covell's evaluation report fails to indicate the presence of specific work-related limitations here that are more severe or extensive than those ultimately adopted by the ALJ.

C.    Ms. Pederson

In his decision, the ALJ further found as follows:

In December 2007, Teresa Pederson, MA/MHP, conducted an intake assessment when the claimant sought out services from Greater Lakes [Mental Healthcare] (Exhibit 8F at 7-17). Ms. Pederson noted the claimant's appearance, behavior and speech to be within normal limits (Exhibit 8F at 8). The claimant presented as depressed, irritable, and had signs of anxiety (Exhibit 8F at 8). Ms. Pederson considered the claimant's concentration, short-term memory and judgment as moderately impaired, long-term memory mildly impaired and orientation and insight to be within normal limits (Exhibit 8F at 9). Ms. Pederson assessed the claimant's strengths as appearing "motivated for services and open to psycho-educational information" (Exhibit 8F at 13). Finally, Ms. Pederson felt the claimant's symptoms were "more consistent with PTSD [post traumatic stress disorder], rather than Major Depressive Disorder" (Exhibit 8F at 15). The claimant was enrolled in community support and residential level of care was not recommended

(Exhibit 8F at 15).

AR 19.  Plaintiff argues the ALJ erred in not also mentioning that Ms. Pederson checked a box

on the evaluation form she completed, indicating her symptoms were "severe and pervasive,"

"greatly" interfered with daily functioning, and were "debilitating", and that Ms. Pederson had

assessed her with a GAF score of 48. AR 306.

Although, as discussed above, it is not necessarily improper for an ALJ to fail to mention

a GAF score, the undersigned does find it was improper for the ALJ not to at least address Ms.

Pederson's opinion that plaintiff's symptoms were severe and debilitating and greatly interfered

with her daily functioning.  Defendant is correct that the ALJ need not discuss every piece of

evidence in the record or cite "magic words" in order for his or her evaluation of such evidence

to be upheld, but rather may meet his or her burden here "by setting out a detailed and thorough

summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof,

and making findings." See Reddick, 157 F.3d at 725; Magellanes, 881 F.2d at 755.  Bu the ALJ

did not discuss the above findings from Ms. Pederson, let alone state an interpretation thereof.

Thus, while the ALJ may have discussed other evidence and could have discounted the findings

Ms. Pederson made in light of that evidence – assuming substantial evidence in the record in fact

supports such a discounting – he did not expressly do so in this instance, nor can it reasonably be

implied that he intended to do so absent mention of the findings at issue here.

Ms. Pederson conducted another assessment of plaintiff in late January 2009, diagnosing

her with opioid dependence and cocaine dependence, both in early partial remission, and a rule

out diagnosis of social phobia, and assessing her with a GAF score of 50. See AR 367.  Plaintiff

argues the ALJ erred in failing to mention this GAF score, along with the fact that Ms. Pederson

found she was restless/agitated and irritable, had a blunted affect and depressed mood, noted she

reported experiencing worry, flashbacks, nightmares, an exaggerated startle reflex, and frequent awake periods during sleep, and stated plaintiff had identified long-standing anxiety symptoms triggered by social situations. See AR 367, 370-71.

The undersigned does find Ms. Pederson's late January 2009 assessment is significant probative evidence the ALJ was required to consider and discuss. Any error on the part of the ALJ in this regard, however, was harmless. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion). First, as discussed in further detail below, the ALJ did not err in discounting plaintiff's credibility, and therefore was not required to adopt any functional limitations based on her report to Ms. Pederson. Second, the mere fact that symptoms of depression and anxiety – such as restlessness, irritability and blunted affect – were noted is not alone sufficient to establish significant work-related limitations. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment constitutes insufficient proof of disability). Third, as noted above, just because an assessed GAF score that has appeared in the record is not mentioned or discussed by the ALJ is by itself not sufficient to overturn an ALJ's residual functional capacity assessment.

D.   Mr. Werner

Plaintiff challenges as well the ALJ's following findings:

Six months after Dr. Covell's examination, a [state agency] requested psychological evaluation was conducted by Mr. [Michael T.] Werner[, M.S.W]. On Mr. Werner's August 19, 2008, evaluation, he considered the claimant as having several "marked" and "severe" functional limitations and he diagnosed Bipolar Disorder, MRE Unspecified and Post-Traumatic Stress Disorder (Exhibit 11F). I discount this evaluation because it appears Mr. Werner relied quite heavily on subject [sic] reports of symptoms and limitations provided by the claimant. During the hearing, the claimant testified that she had been clean and sober during the past three years but during those three years she had three relapses. The claimant stated that one

of these relapses occurred in 2008 and lasted for six months. Yet, there is no discussion of this relapse in section F of his evaluation. Mr. Werner merely stated the "[client] reports that she is only using methadone currently" (Exhibit 11F at 2). Moreover, the evaluation is conclusory and there is no explanation of the evidence relied upon in forming his opinions and diagnosis.

AR 20-21. Plaintiff argues the ALJ erred in so finding, as there is no evidence Mr. Werner relied heavily on her own self-reports. To the contrary, all or nearly all of Mr. Werner's findings seem to be based on what plaintiff told him. See AR 313-16. The ALJ thus did not err in rejecting Mr. Werner's findings on this basis. See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility); Morgan, 169 F.3d 595, 601 (9th Cir. 1999) (same).

It is true that Mr. Werner performed a mental status examination – in which plaintiff was noted to present with latent and tangential speech, limited eye contact and psychomotor agitation – and also observed her exhibiting "a certain amount of hyperactivity." AR 315, 375. However, this hardly outweighs the many notations Mr. Werner made that, as the ALJ pointed out, appear to be largely based on what plaintiff told him. See AR 313-16. Given that it is solely the duty of the ALJ to weigh the medical evidence in the record – and to resolve any conflicts or ambiguities contained therein – the undersigned cannot fault the ALJ for finding as he did, particularly since, as has been just discussed, that finding is supported by substantial evidence.

II.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. See id. at 579. That some of the reasons for discrediting a claimant's testimony should

properly be discounted does not render the ALJ's determination invalid, as long as it is supported by substantial evidence. Tonapetyan , 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

In this case, the ALJ discounted plaintiff's credibility for the following reasons:

In analyzing the credibility of the claimant's subjective complaints, I considered the claimant's daily activities as described to health care providers and mental health counselors, in adult function reports and by the claimant during the hearing. The claimant is able to maintain personal hygiene and grooming and she attends a methadone clinic five times a week, normally at 6:30 am (Exhibits 1E, 5E, 1F, 2F, 4F, 12F). She attends outpatient treatment three days a week from 7:00 to 9:00 am and narcotics anonymous meetings 1 day a week. She uses a combination of public transportation and a friend to drive her to these meetings. When using public transportation to attend outpatient treatment, the claimant must walk to a nearby bus stop, take one bus to a transit center and transfer to another bus to reach her destination. The claimant testified there is another woman at her apartment complex that she talks with regularly. The claimant testified that sometimes they talk in her apartment and sometimes she goes to the other woman's

apartment. The claimant also participates in counseling at Greater Lakes once a week. I note that the claimant stated that she is afraid to leave her apartment and be around people due to anxiety and panic attacks. However, the claimant has no problems with people she knows. In addition, the claimant told Dr. Covell that she prefers to stay close to or in her home as she is enjoying her own space and housing because "I was on the streets for so long." (Exhibit 4F at 6).

The claimant was recommended for HUD housing and thus far appears to have abided by the rules and recommendations. Progress notes covering the period February to June 2009, from Greater Lakes Mental Healthcare state the claimant is consistently keeping her apartment clean and tidy (Exhibit 12F). These same reports also indicate that the claimant is normally pleasant, calm, speaks clearly and has logical and coherent thought processes when visited by the inspection team (Exhibit 12F). The claimant also testified that she takes care of three cats.

The observations by Greater Lakes staff are consistent with the observations made by the claimant's mother last year in an adult function report dated January 7, 2008 (Exhibit 5E). For example, the claimant's mother stated the claimant has a cat that is well cared for; that the claimant did household chores such as cleaning, laundry and ironing; that the claimant reads, watches TV, goes to church, goes to YMCA for sports; that the claimant takes her son skating; and that the claimant goes to a skateboard park, to group meetings and church (Exhibit 5E).

The claimant's Greater Lakes counselor noted the claimant was dressed up for a March 23, 2009, individual therapy session. The claimant stated it made her feel good to dress up. The counselor noted the claimant was in a good mood as evidenced by "her bright mood and affect" (Exhibit 12F at 33). Three days earlier the claimant stated to her therapist she was "feeling better, able to do things more, it is helping." She also indicated she was going on a retreat with her church (Exhibit 12F at 35). The therapist noted the claimant's mood was improved and she was tolerating her medication well (Exhibit 12F at 35).

The claimant was not involved in regular mental health treatment nor is there a history of inpatient mental health treatment between September 1, 2006, the alleged onset date, and December 2007, when the claimant sought services from Greater Lakes (Exhibit 8F). . . .

AR 17-18.

The Ninth Circuit has recognized "two grounds for using daily activities to form the basis of an adverse credibility determination." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). First,

they can "meet the threshold for transferable work skills." Id. Second, they can "contradict [the claimant's] other testimony." Id. Under the first ground, symptom testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Smolen, 80 F.3d at 1284 n.7. However, the claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

Although plaintiff argues defendant has failed to cite to any portion of the ALJ's decision wherein he discounts her credibility on the basis of her daily activities, the ALJ expressly did so as set forth above. Further, the activities the ALJ sets forth, and the record shows plaintiff has engaged in, belie her allegations of disabling limitations. Accordingly, the ALJ did not err in discounting plaintiff's credibility on this basis. In addition, the ALJ may discount a claimant's credibility on the basis of medical improvement. See Morgan, 169 F.3d at 599; Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). Plaintiff does not specifically challenge this reason, and the undersigned once more finds the substantial evidence in the record supports the ALJ here, given that as noted by the ALJ medical improvement in fact had occurred.

Failure to assert a good reason for not seeking treatment, furthermore, "can cast doubt on the sincerity of a claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ in discounting claimant's credibility in part due to lack of consistent treatment; noting fact that claimant's pain was not sufficiently severe to motivate her to seek treatment therefor was powerful evidence of extent to which she actually was in pain); Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered failure to request serious treatment for supposedly excruciating pain). Plaintiff once more argues the ALJ did not state he was discounting her credibility on this basis,

but again the plain language of the ALJ's decision above shows otherwise.

It is true the Ninth Circuit has stated the fact that a claimant does "not seek treatment for a mental disorder until late in the day" is not a proper basis upon which to discount the accuracy of a medical source's assessment thereof. Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (noting those with depression often do not recognize their condition reflects potentially serious mental illness) (citing Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir.1989) (finding invalid ALJ's rejection of claimant's assertions concerning depression due to failure to seek psychiatric treatment, finding questionable practice of chastising one with mental impairment for exercise of poor judgment in seeking rehabilitation)). Here, though, the ALJ did not discount any medical source's opinion on this basis, nor is there any evidence in the record that plaintiff's mental condition caused her to not seek treatment.

III.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. See id. If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id.

A claimant's residual functional capacity thus is what the claimant "can still do despite

REPORT AND RECOMMENDATION - 16

his or her limitations," and is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the residual functional capacity:

> **. . . to perform a full range of work at all exertional levels but with the following nonexertional limitations: able to perform simple, routine tasks and follow short, simple instructions; able to do work that needs little or no judgment and can perform simple duties that can be learned on the job in a short period; can perform goal oriented work (i.e. given task expectations) but not production rate pace work; would have an average ability to perform sustained work activities (i.e. can maintain attention and concentration; persistence and pace) in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) within customary tolerances of employers' rules regarding sick leave and absence; could have occasional interactions with co-workers and supervisors and can work in close proximity to co-workers but not in a cooperative or team effort; could respond appropriately to supervision, co-workers and work situations and deal with occasional work setting changes; could not deal with the general public as in a sales position or where the general public is frequently encountered as an essential element of the work process, however, incidental contact with the general public is not precluded.**

AR 16 (emphasis in original). Plaintiff argues the ALJ erred in assessing the above RFC in light of his errors in evaluating the medical evidence in the record and in assessing her credibility. As discussed above, however, the ALJ did not err in discounting plaintiff's credibility. Nor did the ALJ err in rejecting the findings and opinions of Dr. Covell and Mr. Werner. On the other hand, also as discussed above, the ALJ did err in evaluating the findings and opinions of Dr. Harmon and Ms. Pederson, and thus on this basis his assessment of plaintiff's residual functional capacity

REPORT AND RECOMMENDATION - 17

cannot be upheld.

Plaintiff goes on to argue that the ALJ erred by failing to adopt the moderate to marked mental functional limitations found by Vincent Gollogly, Ph.D., and Bruce Eather, Ph.D., two non-examining consultative psychologists, even though the ALJ stated his RFC assessment was consistent with the functional capacity assessment of the two psychologists. <u>See</u> AR 21, 288-90, 312. But the undersigned finds no error here. The functional capacity assessment Dr. Gollogly and Dr. Eather provided limited plaintiff to remembering and executing simple routine/repetitive tasks, sustaining concentration on simple tasks, carrying out simple, routine social interactions, and no public contact. <u>See</u> AR 290. This assessment clearly is consistent with the limitations the ALJ included in his own RFC assessment, as set forth above.

The moderate to marked limitations plaintiff refers to are contained in Section I of the mental residual functional capacity assessment form Drs. Gollogly and Eather completed. <u>See</u> AR 288-89. Pursuant to the directive contained in the Program Operations Manual System ("POMS"), "**[i]t is the narrative** written by the psychiatrist or psychologist **in [S]ection III . . . that adjudicators are to use as the assessment of RFC**." POMS DI 25020.010(B)(1), https://secure.ssa.gov/apps 10/poms.nsf /lnx/0425020010!opendocument (emphasis in original). It is true that the POMS "does not have the force of law." <u>Warre v. Commissioner of Social Sec. Admin.</u>, 439 F.3d 1001, 1005 (9th Cir. 2006). Nevertheless, the Ninth Circuit has recognized the POMS as being "persuasive authority." <u>Id.</u> Nor does the undersigned find or plaintiff provide any reasons for not following that directive in this case. As such, the ALJ properly looked to Dr. Gollogly's and Dr. Eather's functional capacity assessment contained in Section III in assessing his own RFC of plaintiff, rather than the checked limitations contained in Section I.

Lastly, plaintiff takes issue with the ALJ's statement that the findings and opinions of Dr.

Gollogly and Dr. Eather "deserve greater weight particularly in a case such as this where there is an absence of a longitudinal record containing opinions of treating sources." AR 21. She argues this statement is incorrect, asserting that both Mr. Werner and Ms. Pederson are treating medical sources. The undersigned agrees this is not a clear and convincing reason for giving less weight to the opinions of Mr. Werner and Ms. Pederson. But as discussed above, the ALJ committed no error in rejecting the opinion of Mr. Werner. Also as discussed above, however, the ALJ erred in failing to properly reject that of Ms. Pederson, and thus remand for further consideration thereof is appropriate as discussed below.

IV.    The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted). The ALJ, though, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

REPORT AND RECOMMENDATION - 19

At the hearing, the ALJ posed a series of hypothetical questions to the vocational expert, which contained substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual functional capacity. <u>See</u> AR 65-70.  In response thereto, the vocational expert testified that an individual with those limitations – and with the same age, education and work background as plaintiff – would be able to perform other jobs. <u>See</u> <u>id.</u>  Based on the testimony of the vocational expert, the ALJ found plaintiff to be capable of performing other work existing in significant numbers in the national economy. <u>See</u> AR 22.

Plaintiff argues the ALJ erred in so finding here because the hypothetical questions posed did not contain all of her mental functional limitations.  The undersigned agrees that because the ALJ erred in evaluating the findings and opinions of Dr. Harmon and Ms. Pederson, and because for that reason he also erred in assessing plaintiff's residual functional capacity, it is unclear that the hypothetical questions the ALJ posed accurately describe plaintiff's mental condition.  Thus, it is also unclear whether the ALJ properly found plaintiff to be disabled based on the vocational expert's testimony, and for this reason his step five determination cannot be upheld.  Although it may be true that the vocational expert testified that an individual who had "a severe limitation[, meaning the individual would be so limited two-thirds of the work time,] in the ability to respond appropriately to and tolerate the pressure and expectations of a normal work setting," he or she "would be unable to perform . . . any other jobs" (AR 71-72), once more it is unclear whether the substantial evidence in the record supports such a limitation.  As such, the ALJ was not remiss in declining to adopt it in his decision.

V.    <u>Additional Evidence Submitted to the Appeals Council</u>

After the ALJ issued his decision, plaintiff submitted additional medical evidence to the Appeals Council. <u>See</u> ECF #24.  Plaintiff argues the ALJ erred by failing to remand this matter

for a new hearing in light of this additional evidence.  Defendant argues the Court does not have the authority to review the Appeals Council's decision denying plaintiff's request for review, and in any event that evidence does not justify ordering further proceedings.  But because remand for further proceedings is warranted for the other reasons discussed herein, the undersigned finds it is unnecessary to determine whether this Court has the authority to review the Appeals Council's decision or whether the additional evidence warrants remand, although that evidence clearly can be considered by defendant upon remand of this matter.

VI.     This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

REPORT AND RECOMMENDATION - 21

Because, for the reasons discussed herein, issues still remain in regard to the medical evidence in the record concerning plaintiff's mental impairments and limitations – and thus with respect to her residual functional capacity and ability to perform other work existing in significant numbers in the national economy – remand for further administrative proceedings is warranted.

<u>CONCLUSION</u>

Based on the foregoing discussion, the undersigned recommends that the Court find the ALJ improperly determined plaintiff to be not disabled, and therefore that the Court reverse defendant's decision and remand this matter for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. <u>See</u> <u>also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 16, 2011**, as noted in the caption.

DATED this 28th day of November, 2011.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 22